United States District Court
Southern District of Texas
**ENTERED**
September 16, 2016
David J. Bradley, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# LAREDO DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **VS.** | § | **CRIMINAL ACTION NO. 5:15-CR-778** |
| | § | |
| **NICANOR  MARQUEZ** | § | |

## MEMORANDUM & ORDER

Defendant NICANOR MARQUEZ stands charged by criminal information on one misdemeanor count of forcibly resisting or impeding a federal law enforcement officer under Title 18, United States Code, Section 111(a)(1). (Dkt. 8.) This charge stems from an incident that occurred on June 25, 2015 at the U.S. Border Patrol checkpoint located north of Laredo, Texas on Interstate Highway 35. The incident began when Defendant drove up to one of the checkpoint's primary inspection lanes. To summarize the acts said to give rise to criminal responsibility, Defendant refused to answer immigration-related questions and disobeyed an agent's directive to move his truck to a secondary inspection area.

Before the Court now is Defendant's pretrial motion to dismiss the criminal information (Dkt. 20) brought pursuant to Rule 12(b)(1) of the Federal Rules of Criminal Procedure, which allows a defendant to raise by pretrial motion any defense that can be determined without a trial on the merits. A trial on the merits would indeed appear to be unnecessary here because the defense at issue implicates a pure question of law in the presence of undisputed facts. *See United States v. Flores*, 404 F.3d 320, 323-25 (5th Cir. 2005). The main thrust of the pending motion is that none of Defendant's acts were committed with the required statutory element of "force." The defense takes the position that the Fifth Circuit has yet to define the term "forcibly" for purposes of section 111. (*See* Dkt. 20 at 7.) In the absence of a binding articulation of the term,

Defendant proposes that the Court interpret "forcibly" or "force" to mean something more than is meant in a "physics or engineering sense," a position the Fifth Circuit has approved at least in the context of sentencing. (*See id.* at 11-12.) Were the Court to adopt this proposed definition, it seems clear that Defendant's undisputed conduct—which will be articulated more fully below— would not constitute an offense. In the alternative, Defendant argues that if the meaning of "force" is expansive enough to criminalize his conduct, then section 111 is unconstitutionally overbroad and vague under the First and Fifth Amendments. (*Id.* at 1, 16-19.)

The Government has submitted a response to the motion to dismiss.[1] (Dkt. 23.) Addressing the issue of whether a binding definition of force applies, the Government contends that the Fifth Circuit, through the case of *United States v. Williams*, 602 F.3d 313 (5th Cir. 2010), has already defined the term for purposes of section 111, adopting an interpretation made by the Sixth Circuit in *United States v. Gagnon*, 553 F.3d 1021 (6th Cir. 2009). (*See* Dkt. 23 at 1-4.) In the Government's view, *Williams* establishes that Defendant's conduct gives rise to criminal responsibility. (*Id.*) The Government also offers argument against Defendant's constitutional challenges. (Dkt. 23 at 4-6.)

Having considered the parties' arguments and the applicable law, the Court agrees with the defense that the meaning of the term forcibly for purposes of section 111 remains open to debate in this circuit. The Court is also in agreement with the defense insofar as they are of the opinion that Defendant's conduct did not satisfy the element of force required by section 111. At the same time, the Court finds the Government's views on *Williams* and *Gagnon* to be unfounded. As such, Defendant's motion to dismiss the misdemeanor charge against him will be

---

[1] Also before the Court is the Government's trial brief (Dkt. 19), which discusses many of the issues here in dispute.

granted. Any constitutional rulings are therefore unnecessary.

To outline its ensuing discourse, the Court will begin with a review of the facts—facts which would appear to be undisputed, at least in all essential respects. Following that is a discussion of the general legal standards that govern criminal liability under section 111. The Court will then examine the Government's arguments regarding *Williams* and *Gagnon* and explain why they fail to control an outcome here. Lastly, with an eye towards the arguments by the defense, is the Court's discussion as to the statutory definition of "forcibly" or "force."

### **Factual Background**

For all practical purposes, the following facts are uncontested except where specifically stated otherwise. Indeed, most of these matters are beyond dispute given that multiple video recordings were taken of the encounter. It is notable that two of these recordings were taken by Defendant himself using a cellphone camera. Initially, the cellphone was positioned on the dashboard of the vehicle with the camera lens directed at Defendant and the driver-side window. A separate video was shot by a Border Patrol agent.

The cellphone video begins about one minute in advance of the incident as Defendant and a passenger in his pickup truck, later identified as an Enrique Benavides, are driving up to the checkpoint. Music from the truck's stereo system is playing in the background, and Defendant and Benavides can be heard bantering. Pulling up to the booth at a primary lane, Defendant rolls down the front, driver-side window and is greeted by a Border Patrol agent—identified as Agent Ronald Burgos—with, "How are you doing?" Defendant returns the greeting, and Agent Burgos begins his immigration inspection of Defendant and Benavides.

> Agt. Burgos:   Are you a U.S. citizen? Anybody here in the back [of the truck]? Sitting in the back?

| | |
|---|---|
| Defendant: | Nah-ah. |
| Agt. Burgos: | Can you lower the [rear] window, then? Are you a citizen, there, bro'? |
| Benavides: | Yeah.[2] |
| Agt. Burgos: | Yeah? Where are you from? |
| Benavides: | I don't answer no questions. |
| Agt. Burgos: | Huh? |
| Benavides: | I don't answer no personal questions. |
| Agt. Burgos: | Well, where are you from? |
| Benavides: | I don't answer personal questions. |
| Agt. Burgos: | It's not a personal question. It's a citizen—citizenship question. |
| Benavides: | Where are you from? |
| Agt. Burgos: | Huh? |
| Benavides: | Where are you from? |
| Agt. Burgos: | Oh, are you an agent now? You want—you want my badge, too? |
| Benavides: | Where are you from? |
| Agt. Burgos: | You want my badge, too? |
| Benavides: | You're asking me where I'm from. Where are you from? |

---

[2] Here is the parties' main, if only, factual dispute. According to the Government's assessment of the video, Agent Burgos directs the question at Benavides as he is looking into the back seat of the truck, and it is Benavides who answers "Yeah." (*See* Dkt. 19 at 2.) The defense, on the other hand, contends that Agent Burgos directs his citizenship question at Defendant, who offers the "Yeah" response. (*See* Dkt. 20 at 4-5.) Giving rise to this dispute is the circumstance that Defendant's mouth appears to move after Agent Burgos asks the citizenship question. For the mere sake of argument, it will be assumed herein that Agent Burgos' question is directed at and answered by Benavides. Indeed, the defense concedes that Defendant refuses to state his citizenship at least later in the encounter (*see id.* at 6), as will be detailed momentarily.

Agt. Burgos:   Go ahead and park at number two, over there in secondary.

Benavides:     No, sir, we're not gonna stop at secondary. We need to get on our
               way. We need to keep going. We're in a hurry to get home.

At this point, Defendant reaches down with his right arm, and the cellphone video then appears to physically shake. The parties agree that Defendant shifted the transmission of his truck into the "park" position. Agent Burgos then makes his way out of camera shot and back to his booth.

After a few seconds, an agent, likely Agent Burgos, directs a mostly inaudible question to Defendant. Defendant voices his annoyance with the situation and responds, "I just want to be free—on my way. I don't understand why we have to stop. Did I just cross an international border or something?" The verbal exchange between Agent Burgos and Defendant continues. But because it is difficult to make out what Agent Burgos says for the next portion of the video, only Defendant's statements will be recounted.

Defendant:     Mr. Burgos, did we cross an international border?

Defendant:     So what's the purpose of why—

Defendant:     I understand it's a checkpoint.

Defendant:     Like I said, I'm a private citizen. I'm not gonna answer any
               questions. I'm not gonna answer questions to any federal agent.

Defendant:     No—no. Of this country? Like I said, I'm not gonna answer any
               questions to no federal agent.

Defendant:     I'm sorry, I'm not gonna go to secondary. You have no
               reasonable—suspicion, or you have no probable cause to take me
               to secondary.

Agent Burgos can then faintly be heard saying something to the effect of, "Okay, well, I just need you to get your car out of my way so I can continue doing immigration inspections."

Benavides interjects with, "No, sir, we're not stopping at secondary. We need to get home."
While still somewhat difficult to make out, the substance of Agent Burgos' response is, "I can
move the car for you, if you want." Defendant says, "You will not do that. You will not do
that." There is at this point a break in Agent Burgos' exchange with Defendant and Benavides.[3]
After a few seconds, an agent, presumably Agent Burgos again, can then be heard more clearly.

Agt. Burgos:     Are you sure you don't wanna move your [truck] to secondary?

Defendant:       No, sir, that's okay.

Benavides:       We wanna go on our way.

Agt. Burgos:     If you want, I can do it for you.

Benavides:       We wanna go on our way.

Defendant:       No.

Agt. Burgos:     You want me to do it for you?

Defendant:       You're not gonna touch my vehicle.

Agt. Burgos:     You want me to move it for you? You're in the way. You're
                 impeding traffic.

Defendant:       You're impeding traffic. You're stopping traffic.

Benavides:       You're stopping us. You're impeding traffic.

Agt. Burgos:     You know what, if you don't wanna do it, we can do it for you.

Defendant reaches over towards the camera, and this is where the initial recording ends.
Defendant then resumes recording with his cellphone in hand. The camera is trained on a
Border Patrol agent who is recording the encounter with his own handheld camera. Defendant

---

[3] During this break, Benavides comments to Defendant, seemingly out of Agent Burgos'
earshot, "How are they gonna do that? Hey, lock your doors." Defendant then appears to engage
the door lock with his left hand.

says, "I got cameras too, sir." A supervisory Border Patrol agent, Agent Richard Zelner, approaches the truck, introduces himself as a supervisor, and informs Defendant and Benavides, "If y'all state your citizenship, you'll be on your way." As the defense concedes, Benavides responds by stating that he is a U.S. citizen. Agent Zelner then addresses Defendant directly.

| | |
|---|---|
| Agt. Zelner: | And you? |
| Defendant: | I am not gonna answer any questions. |
| Agt. Zelner: | Alright, can you pull [the truck] over to the secondary inspection area for us? |
| Defendant: | No, sir, that's okay. |
| Agt. Zelner: | If you do not pull over to the secondary inspection area, I have no choice but to arrest you because you're blocking traffic. As you can see behind us— |
| Defendant: | I'm not—we're not blocking traffic, sir. |
| Agt. Zelner: | As you can see behind us, there's a lot of traffic. So what is your choice? |
| Defendant: | I understand. You guys are holding up traffic. |
| Agt. Zelner: | No, I am attempting to conduct an immigration inspection. |
| Defendant: | Okay. |
| Agt. Zelner: | And you are refusing to answer the questions, right? |
| Defendant: | You could—you could ask the questions but I don't have to answer any questions. |
| Agt. Zelner: | Under the Supreme Court—under the United States versus Martinez-Fuerte—authorizes the authority to ask that question. Do you understand that question? |
| Defendant: | Yeah, 'cause you do have the authority to ask, but I don't have to answer any questions. |
| Agt. Zelner: | Are you going to answer any questions, yes or no? |

| Defendant: | I'm not gonna answer any questions, sir. |
|---|---|
| Agt. Zelner: | Excuse me? |
| Defendant: | I'm not gonna answer any questions, sir. |
| Agt. Zelner: | Alright, put the vehicle in—uh—gear—in "park"—please. |
| Defendant: | The truck's in park. You're not gonna touch my vehicle. |

With that, Agent Zelner directs Defendant to step out of the truck and declares that Defendant is under arrest. The agents remove Defendant from the truck and place him in handcuffs.[4] Their efforts to execute the arrest are not met with any resistance on Defendant's part—so much is undisputed. (*See* Dkt. 19 at 4; *see also* Dkt. 20 at 6.) The entire encounter, from the start of immigration-related questioning to arrest, lasts between four and five minutes.

Defendant was later charged with a misdemeanor under section 111(a)(1). The criminal information alleges that Defendant "did knowingly and intentionally, forcibly resist, oppose, impede, intimidate, and interfere with a U.S. Border Patrol Agent, while said Agent was engaged in and on account of the performance of the Agent's official duties." (Dkt. 8.) A trial date was set but postponed upon the filing of Defendant's motion to dismiss the charge.

## Discussion

The Court will now discuss the general legal standards applicable to section 111, followed by the Government's arguments, before moving on to the term "forcibly" and Defendant's lack of criminal responsibility.

---

[4] In removing Defendant from the vehicle, Agent Zelner first reaches in the truck's open window, pulls up on the door lock knob, and then opens the door. These actions are apparent from the video recording taken by the Border Patrol agent.

**A. Legal standard**

In exploring the legislative history of section 111, the Supreme Court has recognized that Congress' purpose behind the statute was to "protect both federal officers and federal functions." *United States v. Feola*, 420 U.S. 671, 679 (1975). It is schematically inherent that "furtherance of the one policy advances the other." *Id.* As these reflections have been framed by the Fifth Circuit, "the dual purpose of the statute . . . is not simply to protect federal officers by punishing assault, but also to 'deter interference with federal law enforcement activities' and ensure the integrity of federal operations by punishing obstruction and other forms of resistance." *United States v. Williams*, 602 F.3d 313, 317-18 (5th Cir. 2010) (quoting *Feola*, 420 U.S. at 678).

Turning to the statute itself, section 111 fashions multiple offenses—a misdemeanor under subsection (a)(1), a felony also under subsection (a)(1), and another felony under subsection (b)—based on the severity of the proscribed conduct. *See Williams*, 602 F.3d at 316; *see also United States v. Ramirez*, 233 F.3d 318, 320-21 (5th Cir. 2000), *overruling on other grounds recognized by United States v. Longoria*, 298 F.3d 367, 372 n.6 (5th Cir. 2002) (en banc) (per curiam). Although Defendant has been charged here with a misdemeanor under subsection (a)(1), the nature of the parties' legal dispute calls for an exposition of that subsection's felony offense as well. The relevant portions of the text are as follows:

> Whoever . . . forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any [federal officer] while engaged in or on account of the performance of official duties . . . shall, where the acts in violation of this section constitute only simple assault, be fined under this title or imprisoned not more than one year, or both, and where such acts involve physical contact with the victim of that assault or the intent to commit another felony, be fined under this title or imprisoned not more than 8 years, or both.

18 U.S.C. § 111(a)(1). At least two statutory terms and one textual ambiguity merit discussion.

First, of course, we have the meaning of the adverb "forcibly." But this is a matter that will be reserved for later. For now, suffice it to say that the Fifth Circuit has interpreted "forcibly" to modify not just assault but all of the acts rendered unlawful by section 111(a)(1). *United States v. Hazlewood*, 526 F.3d 862, 865 (5th Cir. 2008).

Another undefined term of art is that of "simple assault," which comes into play for purposes of the subsection (a)(1) misdemeanor charge. The meaning of "simple assault" converges with the term's usage at common law and has thus been defined as an attempted or threatened battery. *Ramirez*, 233 F.3d at 321-22. In other words, physical contact is not required for a simple assault under the statute. *See id.* at 322.

The term "simple assault" becomes doubly relevant because it implicates a textual ambiguity that several circuits courts have struggled to interpret. This is how the ambiguity was framed by the Fifth Circuit in *Williams*:

> [T]he statute appears to outlaw several forms of conduct directed against federal officers, only one of which is assault, but then distinguishes between misdemeanors and felonies by reference to the crime of assault. The difficulty that has confronted other courts is whether conviction for the non-assaultive conduct apparently outlawed by the statute (*i.e.*, "resist[ing], oppos[ing], imped[ing], intimidat[ing], or interfer[ing]" with a federal officer) requires, at a minimum, conduct that amounts to "simple assault." To put the question another way, can a defendant be convicted of forcible resistance under this statute without having committed an underlying assault?

*Williams*, 602 F.3d at 316. Ultimately, the Fifth Circuit adopted Sixth Circuit precedent, *Gagnon*, to hold that a misdemeanor conviction for any of the non-assaultive acts listed under section 111(a)(1) does *not* require underlying assaultive conduct. *Id.* at 317-18. The reasoning behind what can be referred to as the "*Williams* rule" will be discussed in the following section, which addresses the Government's arguments.

**B. The Government's arguments**

According to the Government, Defendant "forcibly resisted"[5] a federal officer for purposes of section 111 by (1) placing his truck in "park," (2) refusing to move the truck from the primary inspection lane to a secondary inspection lane, and (3) refusing to state whether he was a U.S. citizen. (*See* Dkt. 19 at 15-18; *see also* Dkt. 23 at 2, 5-6.) The defense attacks primarily the sufficiency of (1) and (2). As mentioned before, and to be expanded on later, the defense argues for an interpretation of "force" that goes beyond what is meant in a "physics or engineering sense." (Dkt. 20 at 11-12.) The defense's propositions on the definition of force, however, are effectively ignored by the Government. The Government points instead to *Williams* and *Gagnon* as dispositive of the inquiry. (*See* Dkt. 19 at 10-13; *see also* Dkt. 23 at 1-4.)

In *Williams*, the defendant was arrested over an altercation with three military police officers. *See Williams*, 602 F.3d at 314. The officers approached the defendant as part of their investigation into an indecent-exposure complaint against her. *Id.* The defendant soon became upset and stated that she would not be arrested or go to jail. *Id.* When the officers attempted to handcuff her, the defendant informed them that she suffered from fibromyalgia, a condition that caused her severe pain when touched. *Id.* The officers persisted, so she attempted to thwart them by swinging her arms. *Id.* A struggle ensued as two of the officers then tried to force the defendant to the ground. *Id.* The defendant struck one of them in the face and the other in the jaw. *Id.* According to the officers' own accounts, these blows were not intentional but merely part of the defendant's attempt to prevent the arrest. *Id.* After she was taken into custody, the defendant confirmed to FBI agents that she had moved her arms so that the officers would be

---

[5] Use of the term "resist" and its forms is being used here merely as a shorthand, and should be understood from this point forward to also encompass the terms "oppose," "impede," "intimidate," and "interfere," as charged in the criminal information.

unable to handcuff her. *Id.* The defendant was charged with two felony counts under section 111(a)(1). *Id.* At trial, the district court denied the defense's motions for a judgment of acquittal, and a jury found her guilty. *Id.* The defendant appealed her conviction and sentence.

On appeal, the defendant argued that criminal liability under section 111(a)(1) requires conduct amounting to an assault and that there was insufficient evidence to support such a finding. *See id.* at 315-16. Although not explicitly stated in the *Williams* opinion, the latter position was presumably based on the officers' concessions that the defendant did not specifically intend to strike them. Upon framing section 111(a)(1)'s textual ambiguities, the Fifth Circuit turned to what they recognized as a circuit split. *See id.*

The *Williams* court began with the position taken by the Ninth Circuit in *United States v. Chapman*, 528 F.3d 1215 (9th Cir. 2008).

> In [*Chapman*], the Ninth Circuit held that convictions under the statute "require at least some form of assault." 528 F.3d at 1221. Construing an earlier version of the statute, the Ninth Circuit noted that other circuits "have adopted a construction that leaves no room for a conviction that does not involve at least some form of assault." *Id.* at 1219. More importantly, the Ninth Circuit argued that without requiring some sort of underlying assault, it would be impossible to distinguish non-assaultive misdemeanor resistance cases from felonious resistance cases, because the now-superseded "statutory language clearly limits the category of 'misdemeanors' to cases of 'simple assault' and then categorizes 'all other cases' felonies." *Id.* at 1220. "If Congress had intended to prohibit both assaultive and non-assaultive conduct and intended to distinguish between misdemeanors and felonies based solely on physical contact, it easily could have said so." *Id.* at 1221. To hold that non-assaultive conduct was proscribed by the statute would lead to absurd results, the Ninth Circuit suggested, because "in cases of mere resistance, it is not at all clear that resistance with physical contact is any more culpable than resistance without such contact, especially when . . . the physical contact is initiated by the arresting officer rather than by the arrestee." *Id.*

*Williams*, 602 F.3d at 316-17 (internal citations modified and footnote and emphasis omitted). The Fifth Circuit then went on to discuss the opposing view as espoused by the Sixth Circuit in *United States v. Gagnon*, 553 F.3d 1021 (6th Cir. 2009).

> The Sixth Circuit, also construing the earlier version of [section 111], reached the opposite conclusion. The court reasoned that interpreting [section] 111(a)(1) as requiring an underlying assault for a defendant to be convicted would render meaningless the five forms of non-assaultive conduct that are plainly proscribed by the statute. *Gagnon*, 553 F.3d at 1026. "Congress left much open with [section] 111 . . . but that is no excuse to ignore what it plainly does say." *Id.* Under this reading, the phrase "simple assault" is a "term of art that includes the forcible performance of any of the six proscribed actions in [section] 111(a) *without* the intent to cause physical contact or to commit a serious felony" while "'all other cases' covers the commission of these same violations *plus* the intent to commit a felony or resulting physical contact." *Id.* at 1027.

*Williams*, 602 F.3d at 317 (internal citations modified).

As mentioned, the Fifth Circuit ultimately sided with the Sixth Circuit and thus adopted the rule that a misdemeanor conviction under section 111(a)(1) does not require assaultive conduct. *Williams*, 602 F.3d at 318. Its reasoning went as follows:

> Even before the recent change in the statute, the Sixth Circuit rule was the better one, as it avoided rendering superfluous the other five forms of conduct proscribed by [section] 111(a)(1). The recent change in the statutory language—striking out "all other cases" in the penalty provision of the statute and specifying that the line between misdemeanors and felonies is drawn at physical contact or acting with the intent to commit another crime—also supports the conclusion that [section] 111(a)(1) prohibits more than assault, simple or otherwise. Congress addressed the ambiguity identified by the Ninth Circuit by explicitly drawing the misdemeanor/felony line at physical contact, but it declined the opportunity to delete the other forms of conduct proscribed by the statute or to otherwise clarify that [section] 111(a)(1) convictions require an underlying assault.

*Williams*, 602 F.3d at 317. The *Williams* court found additional support for the Sixth Circuit's reading based on the dual purpose of the statute, which, as mentioned, is to protect officers by punishing assault and to ensure the integrity of their operations by punishing obstruction and other forms of resistance. *Id.* at 317-18 (citing *Feola*, 420 U.S. at 678). Noting that the defendant had admitted to swinging her arms for the purpose of resisting the officers' attempts to handcuff her, the Fifth Circuit applied its new rule to affirm her conviction. *Id.* at 318.

In the present case, the Government is of the opinion that *Williams* and *Gagnon* are determinative of what "force" means for purposes of section 111. The Government alludes to these authorities in representing that "while there is a circuit split relating to what 'forcible' means, the [Fifth] Circuit has adopted the [Sixth] Circuit's interpretation." (*See* Dkt. 23 at 1.) It notes with further reference to *Williams* and *Gagnon* that "the 'forcible' element of [section] 111 is not meant to require actual contact . . . , nor is the 'force' required to rise to the level of 'assaultive' conduct." (*Id.* at 3.) Quoting *Gagnon*, the Government further offers that "what is required is 'forcible performance of any of the six proscribed act[ion]s in [section] 111(a) *without* the intent to cause physical contact or [to] commit a serious felony.'" (*Id.* at 3-4 (quoting *Gagnon*, 553 F.3d at 1027).) And it goes on to propose that the statute is violated "if the defendant commits an 'affirmative act' when he intends to impede, oppose or resist and he is likely to succeed in impeding[,] resisting[,] or opposing." (Dkt. 23 at 4.) Taking these principles into account, it is the Government's conclusion that Defendant violated section 111(a)(1) through the combination of his aforementioned acts and omissions. (*See* Dkt. 19 at 15-18.)

To reach its conclusion, however, the Government circumvents the primary question raised by the defense. True, the *Williams* rule says that assaultive conduct—a threatened battery, at the least—is not required for a misdemeanor conviction predicated on, say, forcibly resisting arrest; and it is perhaps a corollary to this rule that an act of forceful resistance need not amount to an assault. That said, it is obvious that neither *Williams* nor *Gagnon* directly addresses what type of conduct satisfies the meaning of "forcibly" or "force" in terms of the statute. Indeed, to reach this question was unnecessary in those cases because of the manifest forcible resistance involved. Putting this into perspective, the *Gagnon* defendant engaged the agents in what the Sixth Circuit described as "a somewhat tumultuous back and forth," or an apparent physical

struggle.[6] The defendant's physical struggle with the police in *Williams* was perhaps more pronounced. Furthermore, to the extent the Government reads *Williams* and *Gagnon* to say as much, it is simply erroneous that a mere "affirmative act" of resistance would be enough to violate section 111(a)(1). Such a reading utterly ignores the statutory force element, which the Fifth Circuit recognized in *Williams* itself to apply to all of section 111(a)(1)'s unlawful acts. *See Williams*, 602 F.3d at 317 (citing *United States v. Arrington*, 309 F.3d 40, 44 (D.C. Cir. 2002)); *see also Hazlewood*, 526 F.3d at 865.

As such, because *Williams* and *Gagnon* do not specifically address what constitutes force under section 111, these cases fail to determine an outcome for the present case.

## C. The term "forcibly" and Defendant's criminal responsibility

Left for the Court now is the following issue: whether Defendant's acts and omissions are sufficient in their totality to meet section 111's statutory "force" requirement. The defense advocates here for a definition of "forcibly" or "force" that would effectively preclude Defendant's criminal responsibility. According to the defense—

> The Fifth Circuit has [ ] interpreted the term "force" in connection with the United States Sentencing Guidelines. The Fifth Circuit has rejected the interpretation of the term "force" as meaning force in a "physics or engineering sense." *United States v. Sarmiento-Funes*, 374 F.3d 336, 340 (5th Cir. 2004). Citing the Seventh Circuit decision in *Flores v. Ashcroft*, 350 F.3d 666 (7th Cir. 2003), the *Sarmiento-Funes* panel noted that "practically every crime involves 'force' in [the physics and engineering] sense." *Sarmiento-Funes*, 374 F.3d at 340. Because such a broad definition of force [offered by the government in *Sarmiento-Funes*] would result in "collapsing the distinction between violent and non-violent offenses, we must treat the word 'force' as having a meaning in the legal community that differs from its meaning in the physics community." *Flores*, 350 F.3d at 672.

> Under the facts of this case, there is insufficient evidence of force. [D]efendant never threatened anyone, so there is no evidence [that] he threatened to use force.

---

[6] The defendant also spat at the officers, yelled obscenities, and even made himself vomit by sticking his finger down his throat. *Gagnon*, 553 F.3d at 1027-28.

> The mere fact that [Defendant] placed his [truck's] transmission in park when asked to go to secondary, while requiring force in the physics and engineering sense, did not involve the kind of force contemplated to violate [section] 111.

(Dkt. 20 at 11-12 (citations modified).)

What follows is a review of multiple legal authorities addressing the meaning of force in different legal contexts and from various jurisdictions. While no one of these authorities is dispositive, they are nonetheless relevant to arriving at an answer to the question at hand. The Court will then conduct its final analysis of Defendant's criminality under section 111.

### 1. Authorities addressing "force"

This review will begin with one of the primary authorities relied on by the defense, *Flores v. Ashcroft*, 350 F.3d 666 (7th Cir. 2003), a Seventh Circuit case. In *Flores*, the Board of Immigration Appeals ordered the appellant removed from the country based on its determination that he had committed what qualified as a "crime of violence," defined in relevant part by 18 U.S.C. § 16(a) as an offense having as an element the use of physical force against the person or property of another. *Flores*, 350 F.3d at 668-69. The issue on appeal concerned whether the appellant's prior Indiana conviction for misdemeanor battery had as an element the requisite use of force. *Id.* at 668-69, 672. The appellant observed that the slightest contact—even touching someone's glasses or indirect contact by a thrown paper airplane—qualified as a battery in Indiana. *Id.* at 669-70. The court agreed that "[i]t was hard to describe any of this as 'violence.'" *Id.* at 670. The reasons for its conclusion are quite astute and worth laying out in full:

> Section 16(a) refers to the "use of physical force." Every battery entails a touch, and it is impossible to touch someone without applying *some* force, if only a smidgeon. Does it follow that every battery comes within [section] 16(a)? No, it does not. Every battery involves "force" in the sense of physics or engineering, where "force" means the acceleration of mass. A dyne is the amount of force needed to accelerate one gram of mass by one centimeter per second per second. That's a tiny amount; a paper airplane conveys more. (A newton, the amount of

force needed to accelerate a kilogram by one meter per second per second, is 100,000 dynes, and a good punch packs a passel of newtons.) Perhaps one *could* read the word "force" in [section] 16(a) to mean one dyne or more, but that would make hash of the effort to distinguish ordinary crimes from violent ones. How is it possible to commit *any* offense without applying a dyne of force? Section 16(a) speaks of "physical force against the person *or property* of another" (emphasis added). Cashing a check obtained by embezzlement requires lots of dynes to move the check into an envelope for mailing. Suppose someone finds a set of keys that the owner dropped next to his car and, instead of taking them to a lost and found, turns the key in the lock and drives away. One would suppose that to be a paradigm non-violent offense, yet turning the key in the lock requires "physical force" (oodles of dynes) directed against the property (the auto) of another.

To avoid collapsing the distinction between violent and non-violent offenses, we must treat the word "force" as having a meaning in the legal community that differs from its meaning in the physics community. The way to do this is to insist that the force be violent in nature—the sort that is intended to cause bodily injury, or at a minimum likely to do so. We have already drawn just that line. *See Solorzano-Patlan v. INS*, 207 F.3d 869, 875 n.10 (7th Cir.2000); *Xiong v. INS*, 173 F.3d 601, 604-05 (7th Cir.1999). Otherwise "physical force against" and "physical contact with" would end up meaning the same thing, even though these senses are distinct in law. This is not a quantitative line ("how many newtons makes a touching violent?") but a qualitative one. An offensive touching is on the "contact" side of this line, a punch on the "force" side; and even though we know that Flores's *acts* were on the "force" side of this legal line, the elements of his *offense* are on the "contact" side. Because [section] 16(a) tells us that the elements rather than the real activities are dispositive in misdemeanor cases, this conviction cannot properly be classified as a crime of violence, and the basis for Flores's removal has been knocked out . . . .

*Flores*, 350 F.3d at 672. The appellant's removal was thus vacated. *Id.*

In short, the Seventh Circuit defined force essentially as "violent force," or force capable of causing bodily injury. This is consistent with the definition arrived at more recently by the Supreme Court in *Johnson v. United States*, 559 U.S. 133 (2010). The issue in *Johnson* concerned whether the defendant's prior Florida conviction for simple battery had "as an element the use . . . of physical force against the person of another" so as to constitute a "violent felony" under 18 U.S.C. § 924(e)(1), the enhanced penalty provision of the Armed Career Criminal Act.

17 / 28

*See Johnson*, 559 U.S. at 136-37. In defining force, the Supreme Court eschewed its specialized meaning in the field of physics, "a cause of the acceleration of mass," and instead gave the term "its ordinary meaning." *See id.* at 138-39.

> In more general usage [force] means "[s]trength or energy; active power; vigor; often an unusual degree of strength or energy," "[p]ower to affect strongly in physical relations," or "[p]ower, violence, compulsion, or constraint exerted upon a person." [Webster's New International Dictionary 985 (2d ed. 1954)]. Black's Law Dictionary 717 (9th ed. 2009) . . . defines "force" as "[p]ower, violence, or pressure directed against a person or thing."

*Id.* at 139. "All of these definitions," the Supreme Court opined, "suggest a degree of power that would not be satisfied by the merest touching." *Id.* Ultimately, upon recognizing that "context determines meaning," *id.* at 139 (citing *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961)), it held with a nod to *Flores* that "in the context of a statutory definition of '*violent* felony,' the phrase 'physical force' means *violent* force—that is, force capable of causing physical pain or injury to another person," *id.* at 140 (citing *Flores*, 350 F.3d at 672).

One obvious distinction between these cases and the one at hand is with the type of statutes at issue. *Flores* and *Johnson* defined force for purposes of categorical sentencing provisions, while section 111 serves to criminalize certain forcible conduct. Quite recently, however, one of our sister courts from the Western District of Texas, in a case styled *Sophin v. United States*, --- F. Supp. 3d ---, 2015 WL 9308295 (W.D. Tex. Dec. 22, 2015), saw fit to define section 111 force using its "ordinary meaning" as did the *Johnson* court. *Sophin*'s facts parallel the facts here insofar as both cases involve an obstreperous motorist at a Border Patrol checkpoint who refused to answer an inspecting agent's citizenship-related questions. *See id.* at *2. The difference is that the *Sophin* defendant excused himself when the agent momentarily turned his back and drove away from the primary inspection area. *See id.* at *2-3. The defendant was arrested, charged with a misdemeanor under section 111, and found guilty of forcibly

interfering with the agent's official duties upon a jury trial in the magistrate court. *Id.* at *1. After sentencing, the defendant appealed to the district court, challenging the sufficiency of the evidence to prove the element of his use of force. *Id.* at *2. His conviction was reversed. Adopting *Johnson*'s ordinary-meaning analysis, the *Sophin* court reasoned that to define force in terms of something other than "power, violence, or pressure" would only serve to violate the "cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *See id.* at * 11 (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001)). The court stated in its final analysis that—

> [p]erhaps the broadest ordinary definition [in Black's and Webster's] equates force with "power, violence, or pressure directed against a person or thing." Even under this generous definition, the evidence presented at trial is insufficient to uphold [the defendant's] misdemeanor conviction for forcibly interfering with [the agent]. Assuming [the defendant's] act of driving his car constituted "power, violence, or pressure," [the defendant] did not drive toward [the agent], or otherwise direct any power, violence, or pressure against [the agent].

*Id.* (internal citations omitted). Based on this definition, the court held that a rational trier of fact could not have found that the defendant forcibly interfered with the agent. *Id.*

Despite the contextual similarities, the facts of *Sophin* are readily distinguishable from those of the instant case. Where the *Sophin* defendant drove past the inspecting agent and through the checkpoint, Defendant here blocked traffic at the primary inspection lane and refused directives to move his vehicle out of the way. Several courts have addressed the force question in examining conduct that is arguably more similar to this. First is an older case decided by the D.C. Circuit and also identified in the defense's brief, *United States v. Cunningham*, 509 F.2d 961 (D.C. Cir. 1975) (per curiam). The *Cunningham* court recognized that "not all failures to cooperate with federal agents are within [section 111's] prohibition, and that some measure of

presently applied force is required." *Id.* at 963. "Whether a person has opposed the efforts of federal agents with sufficient force to engage the statute can thus be a troublesome question of degree." *Id.* Falling short, the D.C. Circuit presumed, "would be the mere refusal to unlock a door through which federal agents sought entrance." *Id.* (citing *District of Columbia v. Little*, 339 U.S. 1 (1950) (holding that the word "interfere" in a D.C. regulation criminalizing the "interfering with or preventing" of building inspections by health officers could not be interpreted "to encompass respondent's failure to unlock her door and her remonstrances on [Fourth Amendment] grounds")). Nevertheless, the force involved in the *Cunningham* case went far beyond the refusal to unlock a door. The defendant's conviction was upheld based upon the D.C. Circuit's observation that the defendant's "thrashing, kicking, biting, and attempting to exhort others [in a prison line-up] to violence [made] him a substantially more 'forcible' resistor than those whose convictions under the statute [had] been upheld in a number of other cases." *See id.* at 963. Therefore, *Cunningham*'s "locked door" hypothetical remains just that.

At the same time, the D.C. Circuit's reflections do provide some insight into the present issue, and its hypothetical guides our further inquiry. Indeed, the *Cunningham* hypothetical involved the refusal to remove a physical obstacle—*i.e.*, a locked door—between law enforcement officers and the object of their official interest—*i.e.*, the inside of a home. Similar circumstances have been deemed sufficient by at least one other court to constitute force for purposes of a federal regulation identical in all essential respects to section 111. The Court refers here to the Third Circuit's decision in *Lovgren v. Byrne*, 787 F.2d 857 (3d Cir. 1986). In *Lovgren*, agents of the National Marine Fisheries Service sought to conduct a routine inspection of some fish being unloaded from a fishing boat at a dock. *Id.* at 860. The agents identified themselves to the dock owner, who was standing on a platform several feet above the dock, and

requested permission to conduct their inspection. *Id.* As one of the agents climbed up to the platform, his way was obstructed by the dock owner, who came to and stood at the top rung of the ladder. *Id.* The dock owner cussed at the agents and stated that he did not recognize their federal authority to be on the premises. *Id.* When specifically asked by the agent, the dock owner affirmed that he was denying the inspection. *Id.* The agent would later testify that he felt threatened during the encounter, given his physically vulnerable position at the top of the ladder. *Id.* He would also testify to fearing a physical confrontation. *Id.*

The dock owner was eventually charged in part with violating an administrative regulation that made it unlawful to "[f]orcibly assault, resist, oppose, impede, intimidate, or interfere with any Authorized Officer in the conduct of any inspection or search [authorized by the Magnuson Fishery Conservation and Management Act, 16 U.S.C. § 1801 *et seq.* and its regulations]." 50 C.F.R. § 651.7(m). The lower courts found that the dock owner had "forcibly interfered" in light of the agents' uncontested testimony, *see Lovgren*, 787 F.2d at 860, 867, resulting in the imposition of multiple civil penalties, *id.* at 860. On appeal, the dock owner challenged the sufficiency of the evidence on the basis that no actual physical confrontation took place. *Id.* at 862. The Third Circuit rejected the argument:

> [The dock owner] admits that he "was upset" and that he "tends to be a volatile person." Moreover, he agreed that his statements to the agents were "aggressive" and that it was "possible" that his intent was to prevent [the agent] physically from coming up the ladder.

> Both agents testified that [the dock owner's] act and manner of standing at the top of the platform with [the agent] on the ladder below him were "threatening" and [the agent] testified that he believed himself to be in a physically threatening position.

> This testimony supports the . . . conclusion that [the dock owner's] resistance to the inspection contained elements of force and implied threats of violence. The regulation does not require fisticuffs. Forceful resistance, intimidation or

interference suffices.

*Id.* The *Lovgren* court thus affirmed, holding that the dock owner's "lack of cooperation contained elements of forceful resistance," and that such a lack of cooperation was sufficient to support the finding of a regulatory violation.[7] *Id.*

The Court ends its discussion of *Lovgren* by attempting to reconcile the case with the *Cunningham* hypothetical. Both involve situations where a person maintains a physical barrier between officers and the object of their official interest. In *Cunningham*'s hypothetical, the object of official interest is the inside of a home; in *Lovgren*, it is fish on a boat. The critical distinction—and perhaps the circumstance driving each court's respective conclusion—is that the physical barrier maintained against the officers in the *Cunningham* hypothetical is an inanimate object, a door, while the barrier maintained in the *Lovgren* case is the "threatening" resister himself.

*Cunningham* and *Lovgren* come to bear in this case given the Government's argument that Defendant's forcible conduct involved maintaining a physical barrier, his truck, in the

---

[7] Notably, one of the panel judges dissented as to the majority's conclusion that the conduct satisfied the element of force:

> Appellant was not liable to punishment for expressing negative views of the federal program and its officials. The words used, however colorful, cannot be regarded as amounting to assault or intimidation; there is simply no evidence that appellant "*forcibly*" did anything. He just made clear to the inspector that he would not permit the inspector on the dock. This was . . . obviously, I suggest, not a violation of [the regulation].

> There was no use or actual threat of force. The officer's perception that appellant was angry, and the concomitant (alleged) apprehension that, if the officer had insisted on proceeding with the search, force might have been used against him, simply do not suffice to establish a violation . . . .

*Lovgren*, 787 F.2d at 867 (Fullam, J., dissenting in part).

primary inspection lane. (*See* Dkt. 19 at 15-18; *see also* Dkt. 23 at 2, 5-6.) But this conduct can also be characterized as Defendant's failure to follow the agents' directives to move his vehicle, a circumstance which recalls a Fifth Circuit case styled *United States v. Hightower*, 512 F.2d 60 (5th Cir. 1975). In *Hightower*, the Fifth Circuit held that there was insufficient evidence of the use of force within the meaning of section 111 where the defendant refused to hand over his hunting rifle to a federal wildlife agent and "expressed unwillingness to go to the local law enforcement office." *Id.* at 61. The takeaway from *Hightower* is abundantly clear: the mere refusal to follow a law enforcement officer's directive does not satisfy section 111's element of force. Indeed, like *Cunningham*, this holding can also be squared with *Lovgren*'s "lack of cooperation" on the basis that the evidence in *Hightower* made no reference to the defendant's threatening manner or aggressive posturing.

Stepping back, cases like *Flores*, *Johnson*, and *Sophin*, on one hand, and *Cunningham*, on the other, present somewhat of a dichotomy. The former cases approach force *qualitatively*, speaking of the force required as violent in nature. *See Flores*, 350 F.3d at 672 ("This is not a quantitative line ('how many newtons makes a touching violent?') but a qualitative one."). *Cunningham*, however, tends to equate a defendant's general obstreperousness with force and then *quantify* it, speaking of force in terms of "measure" and "degree." *See Cunningham*, 509 F.2d at 963. *Lovgren* and *Hightower* are essentially neutral in their approach, as the courts there simply looked to the respective defendant's conduct and made a determination one way or the other. Along with this recognition comes the prospect of deciding which of these systems to apply in the final analysis. Regardless, making a definitive choice becomes unnecessary because as will be demonstrated next, an analysis under either of these systems yields the same result.

### 2. Analysis

Again, the Government submits that the element of force required by section 111 constelled here when Defendant (1) placed his truck in "park," (2) refused to move the truck from the primary inspection lane to a secondary inspection lane, and (3) refused to state his citizenship. (*See* Dkt. 19 at 15-18; *see also* Dkt. 23 at 2, 5-6.) For purposes of analysis, the respective act and omission referenced in (1) and (2) can be logically grouped together and abstracted—similar to the *Cunningham* hypothetical and the *Lovgren* and *Hightower* situations— as the refusal to follow a directive to remove an obstacle—*i.e.*, the truck—between the agents and the object of their official interest—*i.e.*, the other vehicles making their way to the primary inspection lane. To be sure, the agents also had an interest in determining Defendant's citizenship status. But the Government concedes that charges here would not have been justified had Defendant immediately moved to secondary for further questioning. (*See* Dkt. 19 at 17; *see also* Dkt. 23 at 5-6.) Consequently, the omission referenced in (3) can be all but disregarded.

Clearly, to define force as do the *Flores*, *Johnson*, and *Sophin* courts, that is, as violent force, means that Defendant's acts and omissions were non-criminal. This is a defense argument the Government ignores but would surely concede. As discussed, passive resistance—or what amounts to the kind of resistance that Defendant exhibited here—does not generally fit the meaning of force for purposes of the qualitative system of analysis. The same can be said under the *Hightower* case and its neutral mode of analysis.

The analysis under the quantitative system articulated in *Cunningham*, however, is relatively more complex. Assuming *arguendo* that Defendant's obstreperous conduct constitutes force, one way to frame the issue under *Cunningham* is: whether such force is of a sufficient degree so as to "engage" section 111. *See Cunningham*, 509 F.2d at 963. Several of the cases

discussed in this memorandum provide useful points of comparison—for instance, *Williams* and *Gagnon*. As already recognized, the force involved in those cases was pronounced; both involved defendants who physically struggled with arresting officers. In contrast, Defendant here merely refused to follow the agents' commands to relocate his vehicle, which, again, would be insufficient under *Hightower*. Moreover, when the agents actually attempted to carry out the arrest and move the vehicle themselves, Defendant readily yielded. Indeed, in this latter respect, the force involved here may be of a lesser degree than even our "physical barrier" cases on the opposite end of the force spectrum. *Cunningham* contemplates a refused entry into a home, and in *Lovgren* the agents apparently left the dock without conducting their intended fish inspection.

The Government would perhaps point to the prolonged period of time that Defendant blocked the primary inspection lane. But maybe the only reason that Defendant sat in the way of traffic as long as he did was due to the agents' good graces. The Court would harken here to the familiar case of *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976), where the Supreme Court upheld the brief questioning of motorists at fixed checkpoints near the U.S./Mexico border for the purpose of ascertaining their immigration status. *Martinez-Fuerte* becomes relevant if only to highlight that its holding imposes no limits on Border Patrol's ability to deal with an obstreperous motor-vehicle operator who challenges their authority to conduct immigration-related questioning. In other words, *Martinez-Fuerte* did not require the agents to contend with Defendant for almost five minutes before attempting to extract him from his vehicle. To the extent the agents tolerated Defendant as long as they did here, their patience and tact was commendable. Whatever the case, once push *could* have come to shove, Defendant submitted to

the agents' authority, and he allowed them to continue to engage in their operations.[8]

But even ignoring his eventual submission, the Court concludes that the instant situation is more akin to the *Cunningham* hypothetical than to *Lovgren* insofar as Defendant did erect, at least initially, a physical barrier between the agents and the other vehicles approaching the checkpoint. Like the *Cunningham* hypothetical, the physical barrier here was an inert object—a truck—rather than, as in *Lovgren*, a human being. Generally, of course, the barrier presented by a capable and impassioned person will present a greater potential threat than an inanimate thing. Now, the observation can be made that a truck, like a human being, is potentially mobile and that the truck here was occupied by an impassioned operator. But any similarity to *Lovgren* ends when looking at the actualities of the situation presented. The truck here was placed in "park," and Defendant made it clear that he was not going anywhere. Furthermore, unlike the defendant in *Lovgren*, the truck is not alleged to have sat in a "threatening" juxtaposition to the agents. Nor does the Government suggest that Defendant—though arrogant and rude—ever threatened the agents by words, means, or manner.

For these reasons, the Government cannot establish, based on the undisputed facts, the requisite element of force for purposes of section 111. Maybe the result here would have been

---

[8] Before leaving behind the topic of *Martinez-Fuerte* and the scope of Border Patrol operations, the Court would take note of the Government's position that *Martinez-Fuerte* is in fact crucial to the question of Defendant's criminality. (*See* Dkt. 19 at 14-15.) According to the Government, "[D]efendant's conduct (which amounted to much more than a simple refusal to answer questions), when seen through the prism of both *Martinez-Fuerte* and [section] 111[,] creates criminal liability since he was clearly forcibly impeding, opposing, or resisting the ability of government agents to carry out their official duties." (Dkt. 23 at 2.) The Court has left this argument unaddressed thus far, however, because it lands so far off the mark. Certainly, *Martinez-Fuerte* is relevant insofar as it implicates the element of the offense that the agents here *were engaged in the performance of their official duties*, but that is the limit of *Martinez-Fuerte*'s significance to the instant charge. The mere fact that the agents were operating here pursuant to the authority granted them by *Martinez-Fuerte* cannot be said to have rendered Defendant's conduct any more "forceful."

26 / 28

different had Defendant refused to let off the parking gear as agents tried to push his truck out of the inspection lane, or had he stiffened and pulled away as they tried to extract him from the vehicle. Such circumstances, however, are not before the Court now.

## Conclusion

Accordingly, Defendant's motion to dismiss the criminal information against him (Dkt. 20) is hereby GRANTED.

In closing, the Court takes this opportunity to comment on Defendant's conduct and to assuage what are likely to be the Government's concerns with this opinion. From the context of Defendant's video recording, it seems that Defendant and his cohort, Benavides, viewed their encounter with Border Patrol as little more than a game. A quick search on YouTube reveals that it is crowded with videos of motorists refusing to answer citizenship questions at designated checkpoints. Defendant and Benavides likely intended to get in a few laughs and add just another post to the social-media pile. Conduct of this sort is, of course, cause for concern, and the Government likely takes the view that the instant decision knocks some of the teeth out of section 111's bite as a mechanism for enforcement, deterrence, and punishment.

The instant opinion does not, however, portend the proverbial fall of the sky. Holding up the firmament is *Martinez-Fuerte*. This case, along with other Supreme Court and Fifth Circuit precedent, would support Border Patrol agents' authority—an authority fully exercised here—to detain troublemakers like Defendant and Benavides for as long as it takes to ascertain their immigration status. While such long-standing authority is well-recognized by the legal community, it may not be as familiar to the general public. In for a surprise, therefore, are those motorists who refuse to answer citizenship-related questions for the claimed reason that they would rather "go on their way." Delay and inconvenience will only increase exponentially for

those who then refuse to comply with a command to proceed to a secondary inspection lane. To this, Defendant and Benavides can attest.

True, there will always be a segment of society who wishes to challenge standing authority for some reason or another, be that out of conviction or mere gamesmanship. And the Government would perhaps be more hard-pressed in the face of an epidemic of motorists refusing to submit to secondary inspection. However, the Court has not been presented with any reason to believe that either conscientious objectors or game-players go so far as to disobey such directives on a regular basis. Moreover, the Court would again recognize that Defendant's detention at the primary inspection lane lasted as long as it did simply on account of the patience and tact displayed by the agents involved in the encounter. In any event, for the small minority who are inclined to conduct themselves in a forceful manner, section 111 will continue to serve its vital purpose. Otherwise, to the extent that passive resisters like Defendant are able to pass through a gap in federal law, that gap will have to be filled by statute or regulation.

IT IS SO ORDERED.

SIGNED this 16th day of September, 2016.

_____
Diana Saldaña
United States District Judge

28 / 28